UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CUE, INC.,                              *
                                       *
            Plaintiff,                 *
                                       *
      v.                               *          Civil Action No. 1:13-cv-12647-IT
                                       *
GENERAL MOTORS LLC,                    *
                                       *
            Defendant.                 *

MEMORANDUM & ORDER

July 29, 2016

TALWANI, D.J.

        Plaintiff Cue, Inc., a home radio and speaker business, brings this action for trademark

infringement and various related state and federal law claims against Defendant General Motors,

LLC. The parties have filed cross motions for summary judgment. Because the court finds no

substantial likelihood of confusion in the consuming public, the court DENIES Plaintiff's

Motion for Summary Judgment [#88] and ALLOWS Defendant's Motion for Summary

Judgment [#78].

        I.      Undisputed Facts

                A.  The Parties' Registered Marks

        On February 1, 2007, Plaintiff filed an application with the United States Patent and

Trademark Office ("USPTO") for the mark CUE ACOUSTICS for goods in International Class

9. Def's. Statement Undisputed Material Facts Supp. Def.'s Mot. Summ. J. ¶ 4 [#80] [hereinafter

"Def.'s Facts"]; Pl.'s Statement Undisputed Material Facts Supp. Pl.'s Mot. Summ. J. ¶ 16 [#90]

[hereinafter "Pl.'s Facts"]. After the USPTO initially refused the application (discussed in greater

detail in section III.A *infra*), the USPTO allowed Plaintiff's CUE ACOUSTICS application on

December 8, 2009. Def.'s Facts ¶¶ 5, 10 [#80].

On May 25, 2011, Defendant filed an Intent-to-Use Trademark Application Serial No.

85/329,506 for the mark CADILLAC CUE for International Class 9. Id. ¶ 59; Pl.'s Facts ¶ 48

[#90]. The USPTO approved Defendant's application for publication on September 17, 2011.

Def.'s Facts ¶ 61 [#80].

On March 7, 2012, Plaintiff filed an Intent-to-Use Trademark Application for the mark

CUE. Id. ¶ 33 [#80]; Pl.'s Facts ¶ 21 [#90]; Lawrence T. Stanley Decl. Supp. Def.'s Mot. Summ.

J. [hereinafter "Stanley Decl."] Ex. 27 [#86-27] (Application Serial No. 85/562,946). In that

application, Plaintiff requested registration of the CUE mark in International Class 9 for "table

radios" and "table radios featuring playback capability" among other products, and registration

in International Class 42 for "web-based software applications for uploading, storage, retrieval,

downloading, transmission and delivery of digital content; website featuring technology that

allows users to upload, store, retrieve, download, transmit and deliver digital content." Stanley

Decl. Ex. 27 3 [#86-27].

On June 8, 2012, Plaintiff filed a Statement of Use for the CUE ACOUSTICS mark,

Def.'s Facts ¶ 12 [#80], and on August 21, 2012, the CUE ACOUSTICS mark was registered on

the Principal Register under U.S. Trademark Registration No. 4,194,833 for "table radios and

table radios featuring digital audio playback capability[.]" Id. ¶ 13; Pl.'s Facts ¶ 17 [#90].

Plaintiff remains the owner of the CUE ACOUSTICS mark today. Pl.'s Facts ¶ 18 [#90].

On November 20, 2012, Plaintiff's application for the mark CUE was allowed. Stanley

Decl. Ex. 27 5 [#86-27].

On March 26, 2013, Defendant's CADILLAC CUE mark was registered on the Principal

Register under U.S. Trademark Registration No. 4,309,670 for "user interfaces for electronic

devices sold as an integral part of automobiles[.]" Def.'s Facts ¶ 63 [#80]; Pl.'s Facts ¶ 49 [#90]; Stanley Decl. Ex. 39 5 [#86-39].

On November 20, 2015 (approximately two weeks before the parties' summary judgment motions were filed and after the close of discovery), Cue filed a Statement of Use for the CUE mark. Kendria Pearson Decl. Supp. Pl.'s Opp'n Def.'s Mot. Summ. J. Ex. 45 [#107-10].

### B. Plaintiff's Products

Plaintiff is a Massachusetts corporation that sells high-end table radios and speakers to the home and hospitality markets. Def.'s Facts ¶ 1 [#80]; Pl.'s Facts ¶ 15 [#90]. Plaintiff began selling its products around December 2008, starting with the model r1[1] table radio. Pl.'s Facts ¶ 4 [#90]. The r1 performs standard radio functions and includes an auxiliary input jack and iPhone dock. Id. ¶¶ 4, 24. Also around late 2008, Cue began selling the model s1 satellite speaker, which connects to the r1 radio through a proprietary cable. Id. ¶ 5. Plaintiff subsequently designed the model r2 table radio which includes wireless Bluetooth functionality and connects to smartphones through a wired connection. Id. ¶¶ 6, 25. Plaintiff has also been working for several years to bring a wireless speaker, model PS1, to market. Id. ¶ 7. Plaintiff has "pre-sold" the PS1 for more than three years, but has not yet delivered any units. Def.'s Facts ¶¶ 22, 24 [#80]. Plaintiff's website currently lists the PS1 as "coming soon." Id. ¶ 25.

All of Plaintiff's products are branded with the following stylized version of the CUE ACOUSTICS trademark. Pl.'s Facts ¶ 9 [#90].

---

[1] Plaintiff generally refers to the models as "r1," "r2," "s1," and "PS1," while Defendant refers to them as "R1," "R2," "S1," and "PS1." The court refers to Plaintiff's products using Plaintiff's terms.



The stylized mark appears on the front and back of Plaintiff's table radios. See Stanley Decl. Ex. 53 [#86-53] (Screenshots of products from Plaintiff's website). Plaintiff has also used the CUE ACOUSTICS mark on product packaging and a variety of advertising media including business cards, internet websites, magazines, trade publications, banners, social medial, and other items. Pl.'s Facts ¶ 20 [#90].

Plaintiff's table radios sell for $399, though Plaintiff sells the r2 at a volume discount to hospitality customers. Id. ¶ 26. In 2013, Plaintiff had active relationships with a number of resellers. Stanley Decl. Ex. 14 at 30:10-13 [#86-14] (Keen Dep.). Plaintiff's market share in the audio market has never exceeded a very small percentage. Def.'s Facts ¶¶ 41, 42 [#80].[2]

### C. *Defendant's Products*

Defendant manufactures Cadillac vehicles, several models of which feature the "Cadillac CUE infotainment" or "Human Machine Interface" system. Pl.'s Facts ¶ 62 [#90]; Def.'s Facts ¶ 44 [#80]. That system uses a touch screen, voice recognition, Bluetooth, and toggles mounted on the steering wheel to enable users to control telephone access, GPS navigation, cockpit climate, and other features. Def.'s Facts ¶ 44 [#80]. Around Spring 2011, after a process described in greater detail in section III.B.5 *infra*, Defendant selected the name "CUE" for the system—an acronym for the "Cadillac User Experience." See section III.B.5 *infra*; Def.'s Facts

---

[2] Plaintiff disputes Defendant's characterization of Plaintiff's market share as very small. See Pl.'s Resp. Def.'s Facts ¶¶ 41, 42 [#106]. This dispute is based, however, on Defendant's assertion that the home audio market in 2005 was valued at approximately $4 billion, and Plaintiff contends that this figure is outdated. See id. Even if that is true, common sense dictates that the home audio market has increased in value since 2005 and Plaintiff points to no facts to suggest that it has ever occupied any sizable portion of that market.

¶ 59 [#80].

When the Cadillac CUE system was first introduced in the 2013 model year Cadillac

XTS, the startup screen appeared as follows:



Pl.'s Facts ¶ 64 [#90]. As of the 2015 model year, the word "Cadillac" no longer appears on the

startup screen. Id. ¶ 65.

Defendant first began promoting the Cadillac CUE system in October 2011,

demonstrating it at the Cellular Telephone Industry Association in October 2011. Def.'s Facts

¶ 66 [#80]; Pl.'s Facts ¶ 51 [#90]. Since the launch of the Cadillac CUE system, Defendant has

spent a large amount on advertising in the United States that uses the word "CUE" as a reference

to the system, whether orally or in writing. Pl.'s Facts ¶ 54 [#90]. Defendant has also aired

television and radio ads featuring the Cadillac CUE system. Def.'s Facts ¶¶ 76-77 [#80].

II.     Summary Judgment Standard

Summary judgment in a trademark infringement case, as in others, is appropriate only "if

the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it affects the

outcome of the litigation. Volkswagenwerk Aktiengesellschaft v. Wheeler, 814 F.2d 812, 815

(1st Cir. 1987). A dispute is genuine if "manifested by 'substantial' evidence 'going beyond the

allegations of the complaint.'" Id. (quoting Pignons S.A. de Mecanique de Precision v. Polaroid

Corp., 657 F.2d 482, 486 (1st Cir. 1981)). "While infringement and unfair competition cases

often present factual issues that render summary judgment inappropriate, this is not invariably

so." Kazmaier v. Wooten, 761 F.2d 46, 48-49 (1st Cir. 1985) (citations omitted).

III.     Discussion

Plaintiff accuses Defendant of infringing Plaintiff's trademark and engaging in unfair

competition and deceptive practices, in violation of the §§ 32 and 43(a) of the federal Lanham

Act, Massachusetts common law, and Mass. Gen. Laws ch. 93A. To succeed on a claim of

trademark infringement or unfair competition, Plaintiff must prove that (1) its senior mark is

entitled to trademark protection and (2) the allegedly infringing use is likely to cause consumer

confusion. Bos. Duck Tours, LP v. Super Duck Tours, LLC, 531 F.3d 1, 12 (1st Cir. 2008)

(citation omitted); see also Jenzabar, Inc. v. Long Bow Group, Inc., 977 N.E.2d 75, 82 n.11

(Mass. App. Ct. 2012) (stating that "[t]he gravamen" of a trademark infringement claim under

Massachusetts law "is the same as under the Lanham Act: likelihood of confusion"). While the

dispute here primarily centers on the likelihood of confusion, a brief discussion of the mark(s)

entitled to trademark protection is also warranted.

A. *Plaintiff's Senior Mark*

The parties do not dispute that Plaintiff's CUE ACOUSTICS mark is entitled to

trademark protection. Indeed, registration of a mark on the Principal Register is "prima facie

evidence of the validity of the registered mark and of the registration of the mark, of the

registrant's ownership of the mark, and of the registrant's exclusive right to use the registered

mark in commerce. . . ." 15 U.S.C. § 1115(a).

Plaintiff may be suggesting that the "CUE" portion of its CUE ACOUSTICS mark is also

entitled to trademark protection as a senior mark. That argument is undermined by statements

that Plaintiff made to the USPTO in order to obtain registration of its CUE ACOUSTICS mark.

Specifically, in May 2007, the USPTO issued an "Office Action" refusing registration of

Plaintiff's CUE ACOUSTICS application in part because of a likelihood of confusion with (1) a

pre-existing registered mark "CUE" (used for electronic radio pagers, radio receivers, battery

packs, and battery chargers), and (2) then-pending applications for marks "Q ACOUSTICS" and

"CUE." Stanley Decl. Ex. 5 3-4, 7-10 [#86-5] (May 29, 2007 Office Action). Plaintiff responded

to the USPTO in November 2007 by arguing, in part, that CUE ACOUSTICS mark was

"significantly different" from the two "CUE" marks identified by the USPTO because "the only

common element is the term 'CUE'" and that "the addition of the 'ACOUSTICS' component to

the 'CUE ACOUSTICS' mark significantly distinguishes the CUE ACOUSTICS mark. . . ."

Stanley Decl. Ex. 6 3 [#86-6] (Nov. 29, 2007 Response to Office Action). Plaintiff further argued

that the addition of the term "ACOUSTICS" gave its mark a "significantly different" visual

appearance, a "completely different" sound, and a "distinctive" overall meaning and commercial

impression from the CUE marks cited by the USPTO. Id. at 3-4. Indeed, Plaintiff argued that

"[t]he differences between [its] CUE ACOUSTICS mark and the CUE marks identified [by the

USPTO] are *extremely important*, as each mark is perceived as a whole by the consumer." Id. at

3 (emphasis added). Plaintiff argued to the USPTO that, in light of these "extremely important"

differences, its mark was not likely to be confused with the other CUE marks and that "CUE

ACOUSTICS" should be considered as a single, unitary mark. Id. at 8.

Plaintiff's response to the USPTO further pointed out that many other marks, in addition

to those cited by the USPTO, use the term "CUE" or letter "Q" for radio, electronic, and

transmission-oriented goods, and that those marks co-exist on the Principal Register. Id. at 4-6.

Given the large number of similar marks, Plaintiff argued, the marks identified by the USPTO

"should be warranted a very narrow scope of protection, such that refusal [of the CUE

ACOUSTICS application]. . . should be withdrawn." Id. at 7. In essence, Plaintiff acknowledged

that because the field of CUE-formative marks is crowded, each such mark is entitled to limited

protection, and the scope of each mark's protection is determined by that which distinguishes it from the others. Here, as Plaintiff repeatedly stressed, what distinguishes its mark is the term ACOUSTICS.

Plaintiff's arguments to the USPTO do not bind Plaintiff's subsequent use to its representations as to how it originally conceived of or intended to use its CUE ACOUSTICS mark. Plaintiff's statements to the USPTO do, however, serve to show that the PTO determined that the CUE ACOUSTICS mark was protectable because the mark included the term ACOUSTICS and that Plaintiff acknowledged the importance of the term ACOUSTICS to the mark.[3]

### B. Likelihood of Confusion

The hallmark of any trademark infringement case is the likelihood of confusion. To create a likelihood of confusion, a defendant's infringing conduct must create "a likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care." Bos. Duck Tours, 531 F.3d at 12 (quoting Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Winship Green Nursing Ctr., 103 F.3d 196, 201 (1st Cir. 1996)). The confusion must "exist in the mind of the relevant person." Beacon Mut. Ins. Co. v. OneBeacon Ins. Grp., 376 F.3d 8, 10 (1st Cir. 2004) (citation omitted). Relevant persons are not only the actual or potential buyers of a plaintiff's product, but are also "persons in a position to influence the purchasing decisions or persons whose confusion presents a significant risk to the sales, goodwill, or reputation of the trademark owner." Id. The likelihood of confusion must be "substantial," that is, more than a theoretical possibility. Int'l Ass'n Machinists & Aerospace Workers, AFL-CIO,

---

[3] While Plaintiff has more recently obtained registration of a separate standalone CUE mark, the parties do not dispute that Defendant began using the terms CADILLAC CUE and CUE before this registration occurred. See Def.'s Pl.'s Resp. Facts ¶ 21 [#109]; see also section I.A supra.

103 F.3d at 200.

Plaintiff contends that this case concerns "reverse" rather than "forward" or "direct" consumer confusion. In a typical trademark infringement case alleging "forward confusion" "a weaker junior user [of a mark] attempts to impermissibly bootstrap its product by free-riding on the senior user's goodwill and brand loyalty." Dorpan, S.L. v. Hotel Melia, Inc., 728 F.3d 55, 64 (1st Cir. 2013). Reverse confusion, on the other hand, occurs when a senior user of a mark "is overwhelmed by a more commercially powerful junior user, causing the senior user to lose control over its brand and goodwill." Id. at 65. Regardless, whether presented as a claim of forward or direct confusion, all trademark infringement claims turn on the likelihood of confusion. Id. at 64-65. [4]

To evaluate the likelihood of confusion, the trier of fact analyzes several factors, including (1) the similarity of the marks; (2) the similarity of the goods; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendant's intent in adopting its mark; and (8) the strength of the plaintiff's marks. Pignons S.A. de Mecanique de Precision S.A. v. Polaroid Corp., 657 F.2d 482, 487 (1st Cir. 1981). The court considers each factor individually, and then considers whether, taking the factors together, no reasonable factfinder could conclude that Defendant's use of the terms CUE or Cadillac CUE creates a likelihood of confusion. Dorpan, S.L., 728 F.3d at 65.

---

[4] Defendant argues that reverse confusion is inapplicable because Plaintiff has not demonstrated that Defendant has saturated Plaintiff's market and according to Defendant, such market saturation is critical to a reverse confusion claim. Indeed, Defendant contends that it is entitled to summary judgment on that basis alone. The court does not reach whether a defendant can prevail in a reverse confusion case by demonstrating a lack of market saturation, or whether Defendant has even made that showing here, because the court concludes there is no substantial likelihood of confusion.

### 1. *Similarity of the Marks*

The degree of similarity between the marks is determined by analyzing the marks' sight, sound, and meaning. Bos. Duck Tours, 531 F.3d at 24. "[S]imilarity is determined on the basis of the total effect of the designation, rather than a comparison of the individual features." Pignons, 567 F.2d at 487 (citation omitted). When the "most salient" portion of two marks is the same, there is a greater degree of similarity and a greater likelihood of confusion. See Dorpan, 728 F.3d at 66 ("The marks 'Hotel Meliá' and 'Grand Meliá' are essentially identical for trademark purposes because both marks have the word 'Meliá' as their most salient words."); see also A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 216 (3d Cir. 2000) (stating that "the more forceful and distinctive aspects of a mark should be given more weight, and the other aspects less weight").

The most salient portion of the Plaintiff's composite mark is the non-"CUE" portion. As noted above and as Plaintiff acknowledged to the USPTO, what distinguishes its mark from the many others that use the term "CUE" is the addition of "ACOUSTICS." Thus, while the "Cue" portions of each parties' stylized marks are somewhat visually similar (though far from identical), the overall visual impression of the marks is quite dissimilar.

Defendant contends that its consistent use of the stylized CADILLAC housemark in connection with its CUE system further helps to distinguish its mark from Plaintiff's. In a case of forward confusion, the consistent use of a strong housemark could cause the similarity of the marks factor to weigh more heavily in the junior user's favor. In a case of reverse confusion, however, a junior user's consistent use of a housemark "will *aggravate*, rather than mitigate reverse confusion" by reinforcing the association of the similar mark with the alleged infringer. A & H, 237 F.3d at 230 (emphasis in original); see also Attrezzi, LLC v. Maytag Corp., 436 F.3d

32, 39 (1st Cir. 2006). Regardless, here, because Defendant's mark is so dissimilar from Plaintiff's mark, in that Defendant's mark does not use the term ACOUSTICS, the addition of Defendant's housemark does little to aggravate any possible confusion.

The overall sound of "CUE ACOUSTICS" and "CADILLAC CUE" are also very dissimilar. CUE is the first word in Plaintiff's mark and the second in Defendant's, and the additional words sound nothing alike. While the overall sounds of CUE and CUE ACOUSTICS are more similar, they are still far from identical.

The actual meaning of the marks is difficult to discern, particularly since Plaintiff has acknowledged that the word "cue" has no definition directly related to audio products. Pl.'s Mem. Law Supp. Mot. Summ. J. 9 [#89]. Plaintiff nonetheless argued to the USPTO that its use of "CUE" was meant to conjure cutting-edge technology and music generally. See Stanley Decl. Ex. 6 4 [#86-6]. "CUE" as used by Defendant, on the other hand, has a distinctive meaning as an acronym for "Cadillac User Experience." While the literal meaning of both parties' marks are fairly attenuated, what meanings do exist are highly dissimilar. Accordingly, the similarity of the marks factor favors Defendant.

## 2. Similarity of the Goods

The parties' goods are highly dissimilar and do not directly compete. Plaintiff makes table-top radios and speakers for use in the home; Defendant makes cars with computer interfaces (operated by touch screen, voice command, Bluetooth and steering wheel buttons) that control numerous car features including telephone, GPS, cockpit climate, and audio equipment. Accordingly, the similarity of the good factor weighs heavily in favor of Defendant.[5]

---

[5] The parties devote significant briefing to whether products similar to the Cadillac CUE system are within Plaintiff's "reasonable zone of expansion," and if so, what the significance is. Plaintiff contends that Defendant's products are within its zone of expansion and that the court should

   3.   *Relationship Between Channels of Trade, Advertising, and Prospective*
        *Purchasers*

Courts often evaluate these three factors together as they tend to be interrelated. <u>Beacon</u>

<u>Mut. Ins. Co</u>, 376 F.3d at 19.

First, the parties do not share any channels of trade. Defendant sells its vehicles through

dealers throughout the country and Plaintiff sells (or sold) its radios through a network of retail

stores, formerly through the Skymall catalog, through its website, and on Amazon.com. Def.'s

Facts ¶¶ 15, 100 [#80]. Thus, the channels of trade factor strongly favors Defendant.[6]

Second, the parties only minimally share channels of advertising. While both Plaintiff's

and Defendant's products have been advertised at the Consumer Electronics Show, in magazines

including *Fast Company* and *Fortune* (Defendant in the print version, Plaintiff in the online

version), and in newspapers including the New York Times, Pl.'s Facts ¶¶ 27, 55 [#90], there is

no evidence that they ever appeared in the same publication at the same time. Def.'s Resp. Pl.'s

Facts ¶¶ 27, 55 [#109]. Moreover, the bulk of Defendant's advertisements related to the Cadillac

CUE system have been radio and television advertisements, media that Plaintiff has never

---

therefore view Plaintiff's potential future goods as similar to Defendant's goods. Plaintiff points
to no First Circuit authority that endorses the "reasonable zone of expansion" doctrine as
Plaintiff describes it. Indeed, the only First Circuit case to address any zone of expansion
doctrine, <u>Raxton Corp. v. Anania Assocs.</u>, 635 F.2d 924, 930 (1st Cir. 1980), rejected the
doctrine as applied to a claim that a junior user's geographically distinct market was within the
senior user's zone of expansion. Moreover, the court notes that the only evidence that Plaintiff
actually intends to move into Defendant's market is undermined by its timing, arising only after
Plaintiff had learned about Defendant's use of CUE and after Plaintiff had begun working with a
lawyer. <u>See</u> Pl.'s Resp. Def.'s Facts ¶ 98 [#106]. In addition, Plaintiff offers no evidence that its
hypothetical expansion into car infotainment systems is at all feasible. <u>See</u> Def.'s Mem. Law
Supp. Mot. Summ. J. 22 [#79]. Accordingly, it is doubtful that products like the Cadillac CUE
are within Plaintiff's "reasonable zone of expansion."

[6] Plaintiff contends that if it were to expand into Defendant's market with a product similar to the
Cadillac CUE, the parties' channels of trade would overlap. <u>See</u> *supra* note 5. Again, the court
doubts that such an expansion is plausible. <u>Id.</u>

touched. Def.'s Facts ¶¶ 74-81 [#80]. This factor therefore favors Defendant.

Third, the parties' target purchasers do overlap significantly, in that both parties target relatively sophisticated customers. Pl.'s Facts ¶¶ 28, 56 [#90]. Such a considerable overlap in the parties' prospective purchasers could lead to a higher likelihood of confusion. However, having customers generally characterized as sophisticated and products that are relatively expensive tends to mitigate any likelihood of confusion. See Attrezzi, 436 F.3d at 39-40 ("Both parties aim at basically the same high-end customers, a point in favor of Attrezzi LLC, but conceivably customer sophistication could also ameliorate confusion."); see also Astra Pharm. Prods., Inc. v. Beckman Instrs., Inc., 718 F.2d 1201, 1206 (1st Cir. 1983) ("[T]here is always less likelihood of confusion where goods are expensive and purchased after careful consideration."); Alta Vista Corp. Ltd. v. Dig. Equip. Corp., 44 F. Supp. 2d 72, 78 (D. Mass. 1998) (stating that "[w]hile both parties do business with sophisticated clients . . . this does not tilt in favor of finding confusion" because "the sophistication of [the plaintiff's clients] is sufficiently high that they can be expected to know the difference between an Internet search service and a literary agency"). Accordingly, the relationship between the parties' prospective purchasers favors Defendant.

### 4. Evidence of Actual Confusion

Evidence of actual confusion is "often deemed the best evidence of possible future confusion," Attrezzi, 436 F.3d at 40, though an absence of evidence of actual confusion is not dispositive of the likelihood of confusion. Borinquen Biscuit Corp. v. M.V. Trading Corp., 443 F.3d 112, 120 (1st Cir. 2006). Nonetheless, at least where goods are directly competing, "an absence of actual confusion, or a negligible amount of it, between two products after a long period of coexistence on the market is highly probative in showing that little likelihood of confusion exists." Aktiebolaget Electrolux v. Armatron Int'l, Inc., 999 F.2d 1, 4 (1st Cir. 1993).

There is little if any evidence of actual confusion here. Indeed, Plaintiff responded during discovery to Defendant's request for admissions that it is "unaware of an instance of actual confusion between [Defendant's] and [Plaintiff's] products in the mind of a prospective customer." Stanley Decl. Ex. 65 6 [#86-66].

After discovery closed, however, Plaintiff encountered what it contends is an instance of actual confusion. The incident is documented by Plaintiff in the <u>Declaration of Darryl Cushon</u> [#92] dated October 15, 2015. Mr. Cushon states that he is a Cadillac XTS owner and that after several days of not being able to figure out how to get his Cadillac CUE system to play videos, he called some of Defendant's dealers for help but they were not able to help him. Darryl Cushon Decl. Supp. Pl.'s Mot. Summ. J. ¶¶ 4, 10-11 [#92]. Cushon states that he then decided to go "straight to the source, rather than to the dealer, and call the manufacturer of the Cue system." <u>Id.</u> ¶ 12. Cushon further states that he "searched the Internet for the company that made the Cue system" and found Plaintiff's phone number and that he thought that Plaintiff "was the company that made the Cue system in the Cadillac." <u>Id.</u> ¶ 13. Cushon then called Plaintiff and only then learned that Plaintiff did not make the Cadillac CUE system. <u>Id.</u> ¶ 14.

Though Defendant did not have an opportunity to depose Cushon, Defendant did obtain its own <u>Declaration of Darryl Cushon</u> [#85] dated Oct. 28, 2015. That declaration states that Cushon's friend searched for the maker of the Cadillac CUE system on his cell phone, not Cushon himself, and that Cushon just called the phone number that his friend located. Darryl Cushon Decl. Supp. Def.'s Opp'n Pl.'s Mot. Summ. J. <u>Id.</u> ¶¶ 2-3 [#85]. In his second declaration, Cushon declares that prior to calling Plaintiff he had no idea what types of products Plaintiff sells, had never seen Plaintiff's products, and that the products Plaintiff sells had nothing to do with why he called Plaintiff. <u>Id.</u> ¶¶ 4, 5.

Defendant argues that Cushon's second declaration proves that his incident was not an instance of reverse confusion at all. Specifically, because Cushon had no idea what products Plaintiff offers, he did not mistakenly associate Plaintiff's products with Defendant. Rather, to the extent Cushon was confused, it was in thinking that Defendant's products were associated with Plaintiff. Defendant is correct to note that this type of confusion is more typical of direct confusion. At the same time, "isolated instances of 'direct' confusion may occur in a reverse confusion case, and vice-versa." A & H Sportswear, 237 F.3d at 233. Nonetheless, because the evidence of *any* confusion is so slim, and because Plaintiff offers no evidence that Cushon was a likely customer (i.e. "a relevant person"), this factor weighs only marginally in Plaintiff's favor if at all.

### 5. *Defendant's Intent*

The "bad faith" of the alleged infringer in adopting its mark may also be relevant to the likelihood of confusion analysis. Attrezzi, 436 F.3d at 40. The First Circuit has drawn an important distinction between the "willfulness" and the "bad faith" of an alleged infringer. See Visible Sys. Corp. v. Unisys Corp., 551 F.3d 65, 75 (1st Cir. 2008). While willfulness may be relevant to damages after a finding of infringement, only bad faith is relevant to a likelihood of confusion—*i.e.*, whether infringement has occurred in the first place. Id. Specifically, the First Circuit has held that a defendant willfully infringes if it adopts a mark despite knowledge of a senior user's mark, but only acts in bad faith if it adopts a mark with the intent to create confusion. Id.; see also Baker v. Simmons Co., 307 F.2d 458, 465 (1st Cir. 1962) ("If it can be shown the selection of a name or symbol is part of a calculated or preconceived plan to play on the drawing power of a 'congenial symbol' then this factor will assuredly enhance a plaintiff's position on the issue of likelihood of confusion.").

Plaintiff argues that the court can infer bad faith from the facts regarding Defendant's adoption of the "CUE" name. In 2010, Defendant formed an ad hoc naming committee to select a name for Defendant's forthcoming "infotainment" system. Def.'s Facts ¶¶ 43-44, 46 [#80]; Pl.'s Facts ¶ 32 [#90]. The ad hoc committee then generated a short list of possible names for the system which included CUE and five others. Pl.'s Facts ¶ 34 [#90].[7]

Defendant then conducted market research to gauge consumer reaction to the names on the short list. Id. ¶ 38. Of those, CUE fared best. Id. The results of the market research were presented to Defendant's Vice President of Marketing for Cadillac Don Butler. Id. ¶ 39.

After the market research was complete, around January 2011, Defendant commissioned a full trademark search from CT Corsearch for the word "Cue." Def.'s Facts ¶ 50 [#80]; Pl.'s Facts ¶ 41 [#90]. The CT Corsearch report revealed hundreds of third parties that had registered and/or were using variations of the "cue"-related marks as stand-alone marks or as part of composite marks. Def.'s Facts ¶ 52 [#80]. Defendant (through its in-house counsel Tim Gorbatoff) first learned about Plaintiff, its website www.cue.com, and Plaintiff's then-pending trademark application for the CUE ACOUSTICS mark through this search, no later than April 3, 2011. Id. ¶¶ 53, 54; Pl.'s Facts ¶ 42 [#90].

After learning about Plaintiff and its CUE ACOUSTICS application, Gorbatoff delivered a legal opinion regarding use of the Cadillac CUE name in April 2011. Def.'s Facts ¶ 58 [#80]. Gorbatoff also told Brad Merrill—the member of the ad hoc team assigned to be the liaison with

---

[7] After Defendant's legal department ran a preliminary trademark search on the names on the short list, Defendant excluded one name (CORE) from the list. Pl.'s Facts ¶¶ 35-36. At the time of the preliminary search, CORE was a registered trademark of Stillwater Designs and Audio, Inc. for goods including "electronic interface for permitting charging, control, and audio/video connectivity for MP3 devices in automotive and home audio/video systems." Pl.'s Facts ¶ 37 [#90]; David B. Kellis Decl. Supp. Pl.'s Mot. Summ. J. [hereinafter "Kellis Decl."] Ex. 27 2 [#93-29].

the legal department—about Plaintiff, but did not tell anyone else on the ad hoc team. Pl.'s Facts ¶ 43 [#90]. Indeed, neither Patrick Nally (the leader of the ad hoc naming committee) nor Don Butler (the executive primarily responsible for selecting the name) learned about Plaintiff until this litigation. Kellis Decl. Ex. 17 at 98:16-99:10 [#93-19] (Nally Dep.); Kellis Decl. Ex. 22 at 83:2-4 [#93-24] (Butler Dep.). Patrick Nally testified at deposition that he "would have expected [Merrill] to communicate [information about Plaintiff's website and pending trademark application]" to him, but that Merrill only told him that Defendant was "clear to use" the CUE name. Pl.'s Facts ¶ 44 [#90].[8] Defendant did not contact Plaintiff after discovering Plaintiff's trademark rights and the ad hoc committee did not consider whether to select a different name for the infotainment system after Defendant commissioned a full trademark search. Id. ¶ 47.

These facts establish that Defendant knew about Plaintiff's mark before adopting its own. As noted above, however, Defendant's knowledge of Plaintiff's mark may establish willfulness, but not necessarily bad faith. Visible Sys., 551 F.3d at 75; see also NEC Elecs., Inc. v. New England Circuit Sales, Inc., 722 F. Supp. 861, 866 (D. Mass. 1989) ("[M]ere knowledge of the existence of a competitor's mark is insufficient to prove bad faith.") (citing Ziebert Intern Corp. v. After Mkt. Assocs., Inc., 802 F.2d 220, 227 (7th Cir. 1986)). Plaintiff argues that Defendant's adoption of the CUE name with knowledge of Plaintiff's mark evidences a "reckless disregard" for Plaintiff's rights, and that such recklessness can support a finding of bad faith. The two cases Plaintiff cites for this proposition, however, state that recklessness may support a finding of willfulness, not bad faith. See Pl.'s Mem. Law Supp. Mot. Summ. J. 21 [#89] (citing Fendi Adele

---

[8] Defendant contends that this testimony was given in response to a question that was objectionable on multiple grounds, including lack of foundation and speculation, and is therefore inadmissible. See Def.'s Resp. Pl.'s Facts ¶ 44 [#109]. Reading the question in context, the foundation is well-laid and it is clear that Nally is testifying only to his state of mind.

S.R.L. v. Burlington Coat Factory Warehouse Corp., 689 F. Supp. 2d 585, 599-600 (S.D.N.Y.

2010) ("The standard for willfulness is whether the defendant had knowledge that his or her

conduct represented [trademark] infringement or recklessly disregarded the possibility.");

Johnson & Johnson Consumer Cos. v. Aini, 540 F. Supp. 2d 374, 396 (E.D.N.Y. 2008)

("[W]illful infringement may be attributed to the defendant's actions where he had knowledge

that his conduct constituted infringement or where he showed a reckless disregard for the

owner's rights" (citation omitted)). Here, where the parties' goods are so dissimilar, and where

hundreds of third parties had registered or were using variations of "cue"-related marks, it is not

reasonable to infer bad faith from the Defendant's knowledge of Plaintiff's mark. See Riverbank,

Inc. v. River Bank, 625 F. Supp. 2d 65, 75 (D. Mass. 2009) ("Given that the Bank and Riverbank

are not competitors and do not offer the same services, it would not be reasonable to infer that

the Bank intended to 'reap what it had not sowed' or get a 'free ride.'" (citation omitted)).

Indeed, Defendant favoring the CUE name before learning of Plaintiff or its products,

and then officially selecting the CUE name after conducting a trademark search is the sort of

reasonable care that undercuts any suggestion of bad faith and even supports a finding of good

faith. Astra Pharm. Prods., 718 F.2d at 1208 ("[W]e cannot presume bad faith on the part of

Beckman when the undisputed evidence shows that it arrived at the mark independently and

adopted it only after a careful trademark search."); see also Star Indus., Inc. v. Baccardi & Co.,

Ltd., 412 F.3d 373, 388 (2d Cir. 2005) ("[E]ven where a trademark search resulted in knowledge

of the earlier mark, in the absence of additional evidence indicating an intent to promote

confusion or exploit good will or reputation, this Court has found the junior user to be in good

faith." (citations omitted)).

A finding of good faith is all the more appropriate here, where Plaintiff itself

acknowledged the "widespread use" of other CUE-formative marks and persuaded the USPTO that its own mark would not cause confusion, in part because there were so many marks similar to it on the Principal Register, and because it was using the combined term CUE ACOUSTICS. See Freedom Card, Inc. v. JPMorgan Chase & Co., 432 F.3d 463, 479-480 (3d Cir. 2005) (finding that the defendant "conduct[ing] a trademark search, learn[ing] of [the plaintiff's] FREEDOM CARD mark and nevertheless adopt[ing] the CHASE FREEDOM mark" is proof of "carelessness at best" and not bad faith, particularly in light of the plaintiff's own filings with the PTO which acknowledged the prevalence of the word "freedom" in the relevant marketplace).

In sum, there is no evidence that Defendant adopted the CUE name with the intent to confuse. Accordingly, the intent factor does not favor Plaintiff. Because the intent factor "usually matters only where an alleged infringer copied a mark in bad faith" and "a converse finding of good faith carries little weight," Beacon Mut. Ins., 376 F.3d at 19 (citation omitted and quotation marks omitted), this factor favors neither party.

### 6.  Strength of the Plaintiff's Mark

A mark's strength is primarily evaluated "on the basis of its commercial strength, analyzing such factors as 'the length of time a mark has been used and the relative renown in its field; the strength of the mark in plaintiff's field of business; and the plaintiff's action in promoting the mark.'" Bos. Duck Tours, 531 F.3d at 16 n.14 (quoting Equine Techs., Inc. v. Equitechnology, Inc., 68 F.3d 542, 547 (1st Cir. 1995)).

Plaintiff's CUE ACOUSTICS mark has been in use for less than eight years. Plaintiff's efforts to promote its CUE ACOUSTICS mark have also been minimal. Plaintiff has spent a small amount on advertising to date, has shown its products once at the Consumer Electronics Show, advertised in various newspapers and magazines, and marketed its products through

SkyMall, on its website, and on Amazon.com.

In addition, "[u]se of similar marks by third-party companies in the relevant industry weakens the mark at issue." M2 Software, Inc. v. Madacy Entm't Co., 421 F.3d 1073, 1088 (9th Cir. 2005); see also Time, Inc. v. Petersen Publ'g Co., 173 F.3d 113, 118 (2d Cir. 1999) (directing courts to look at "[t]he use of part or all of the mark by third parties" because third-party use "weakens its overall strength"). As noted above, when seeking registration of the CUE ACOUSTICS mark, Plaintiff acknowledged to the USPTO the "widespread use" of marks that "incorporate the CUE or 'Q' component[] for various radio, electronic, and transmission-oriented goods and services." Stanley Decl. Ex. 6 4 [#86-6]. While Plaintiff is correct that the prevalence of similar marks on the Principal Register is not necessarily evidence that the marks are prevalently used in the market, here Plaintiff explicitly argued that the "widespread use" of the CUE term entitled marks using that term to "a very narrow scope of protection." In light of this admission, it would be illogical to conclude that any such CUE-formative mark is strong.[9]

Plaintiff does not contend that its mark is strong. Rather, Plaintiff argues that in reverse confusion cases, courts should compare the strength of the plaintiff's mark against the strength of the defendant's use of the mark, and that a plaintiff's comparatively weaker mark helps rather than hurts the plaintiff in such cases. See Visible Sys. Corp., 551 F.3d at 74 ("In a reverse confusion case, the focus is on the *relative* strengths of the marks so as to gauge the ability of the

---

[9] Defendant argues further that the court should also consider the conceptual strength of Plaintiff's CUE ACOUSTICS mark, not just its commercial strength. "Conceptual strength" "refers to the mark's placement on the spectrum of distinctiveness." Bos. Duck Tours, 531 F.3d at 16 n.14. The First Circuit has "tended to focus [the] strength analysis on 'practical matters [related to a mark's perception in the marketplace] and not the legal classifications of the mark' . . . ." Id. at 16-17 (quoting Attrezzi, 436 F.3d at 40) (internal citation omitted, brackets in original). Nonetheless, the First Circuit has considered conceptual strength "where a composite mark contains an arguably generic phrase." Id. at 17. Neither party argues that CUE ACOUSTICS contains an arguably generic phrase.

junior user's mark to overcome the senior user's marks.") (emphasis added); Freedom Card, Inc., 432 F.3d at 477 ("[A]nalysis of the strength of the senior user's mark is relevant in a reverse confusion case." (internal quotation marks and citation omitted)). Defendant's CADILLAC CUE and CUE marks here are relatively stronger than Plaintiff's CUE ACOUSTICS mark, and this factor therefore weighs in favor of Plaintiff.

### 7. Conclusion of Likelihood of Confusion Analysis

Taking these factors together, the dissimilarity of the marks, the different channels of trade and advertising, the sophisticated potential consumers, the lack of evidence of actual confusion, and the absence of any bad faith strongly outweigh any possibility of confusion despite the weakness of the CUE ACOUSTICS mark. Accordingly, no reasonable jury could find a substantial likelihood of confusion among the consuming public.[10]

### C. Application to Causes of Action

Plaintiff's trademark infringement and unfair competition claims under the Lanham Act and Massachusetts common law (Counts I, II, III and IV) are all judged by same the likelihood of confusion standard. Having found no substantial likelihood of confusion, Defendant is entitled to summary judgment on Counts I through IV. See Astra Pharm. Prods., Inc., 718 F.2d at 1209.

---

[10] Defendant notes that Plaintiff offers no expert opinion as to the likelihood of confusion and no consumer surveys, and suggests the court should draw a negative inference from Plaintiff's failure to do a survey. The court declines Defendant's invitation. The court does note, however, that in Defendant's survey, after respondents were shown webpages from Plaintiff's website featuring Plaintiff's products, no respondents identified the Cadillac CUE system as a product provided by Plaintiff, and only 6% of respondents identified car audio equipment as a product manufactured by Plaintiff. See Michael Mazis Decl. Ex. 1 ¶ 32 [#81-1] (Report on Consumer Survey). Moreover, Defendant's survey respondents did not identify Defendant or Cadillac as sponsoring any products on Plaintiff's website. Id. ¶ 34. Plaintiff contends that flaws in Defendant's survey design and execution render the results of little value. The court does not resolve the parties' dispute over the weight that Defendant's survey results should be accorded on summary judgment. The court does note, however, that Defendant's survey casts no doubt on the independent conclusion that the court reaches from the Pignons analysis.

With no surviving trademark infringement claim, Defendant is also entitled to summary judgment on Plaintiff's claim for cancellation of the registration of Defendant's CADILLAC CUE mark (Count VI). Finally, in the absence of likelihood of confusion and the absence of bad faith, Defendant is also entitled to summary judgment on Plaintiff's Chapter 93A claim (Count V), which is based on the same allegations as its unfair competition and trademark infringement claims. See Unleashed Doggie Day Care, LLC v. Petco Animal Supplies Stores, Inc., No. 10-1072-DJC, 2011 WL 6812642, at *16 (D. Mass. Dec. 28, 2011) ("[Plaintiff's] Mass. Gen. L. c. 93A claim is based on the same allegations as those under the Lanham Act. . . . However . . . , [plaintiff] has failed to show . . . that [defendant] infringed on [its] protected mark. Thus it cannot be said that [defendant] has engaged in any actionable conduct under Mass. Gen. L. c. 93A based on those same allegations."); Bay State Sav. Bank v. Baystate Fin. Servs., LLC, 484 F. Supp. 2d 205, 219 (D. Mass. 2007) ("Because defendant had the legal right to use the 'Baystate Financial' mark to market its insurance and investment services and because there is no evidence that the defendant acted improperly or in bad faith, plaintiff cannot establish that the defendant's acts were 'immoral, unethical, oppressive, or unscrupulous,' or otherwise violated Chapter 93A."); Black Dog Tavern Co., Inc. v. Hall, 823 F. Supp. 48, 60 (D. Mass. 1993).[11]

IV.    Conclusion

Defendant's Motion for Summary Judgment [#78] is ALLOWED and Plaintiff's Motion for Summary Judgment [#88] is DENIED.

IT IS SO ORDERED.

Date:  July 29, 2016                                        /s/ Indira Talwani
                                                           United States District Judge

---

[11] The court does not reach the parties' remaining arguments concerning Defendant's affirmative defenses.